COMMONWEALTH of Pennsylvania,
Appellee

v.

Audrey E. QUEL, Appellant.

Superior Court of Pennsylvania.

Submitted April 25, 2011.
Filed Aug. 23, 2011.

Michael D. Foglia, Pittsburgh, for appellant.

Michael W. Streily, Deputy District Attorney, Pittsburgh, Margaret Ivory, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., BOWES, and MUNDY, JJ.

OPINION BY STEVENS, P.J.:

Appellant Audrey Quel (hereinafter "Appellant") appeals from the judgment of sentence entered in the Court of Common Pleas of Allegheny County on June 28, 2010,[1] at which time she was sentenced to an aggregate term of seven (7) years' probation, placed in a county intermediate punishment program for twenty-three (23) months with credit for time served and required to pay restitution in an amount of $29,310.20 following her conviction of one count each of Theft by Deception, Theft by Failure to Make Required Disposition of Funds Received, and Theft by Unlawful Taking or Disposition.[2] Upon our review of the record, we affirm Appellant's judgment of sentence and dismiss her ineffective assistance of counsel claim without prejudice to her ability to raise it on collateral review.

The trial court summarized the facts herein as follows:

The government's case was the epitome of a prosecution upon which circumstantial evidence controlled the outcome. There was no evidence that anyone saw [Appellant] take money. However, there was an abundance of circumstances that put the money in [Appellant's] pocket.

[Appellant] began her job as assistant secretary/bookkeeper for the Moon School District in August, 2007. Her job required multi-tasking. One job function was to account for, deposit and generate records for the various student groups who may raise money throughout the school year. The process worked in rather simplistic fashion. A student group would conduct a fundraiser like selling hoagies. When the money was collected from that function a particular type of deposit envelope would be completed by a representative of that student group and/or the group's sponsor, traditionally a member of the teaching staff. The deposit envelope required the contents to be broken down by the number of twenty dollar bills, ten dollar bills, five dollar bills, one dollar bills, coins and checks. When the deposit envelope was completed, it was delivered to [Appellant] or, if she was not present, given to a member of the secretarial staff or the administrative staff (i.e. principal or his assistant). Whether by [Appellant] herself, or by someone else, the deposit envelope was then placed in the "safe" which was located inside a "safe room[."] At an appropriate time during her workday, [Appellant] would then retrieve the deposit envelope and verify its contents. She would count the money and verify what was numerically reflected on the outside of the envelope matched what was actually inside the envelope. With very few exceptions, [Appellant] found the money inside the envelope matched the figure on the outside of the envelope.

The next step in the process is where the defense's theory breaks down. According to [Appellant], the next step in the process was to complete a bank deposit slip, put the money and the deposit

---

1. Appellant had previously been sentenced on March 9, 2010, to an aggregate sentence of seven (7) years' probation, eleven and one-half (11½) months to twenty-three (23) months' incarceration and required to pay restitution in an amount of $29,310.20

2. 18 Pa.C.S.A. §§ 3922(a)(1), 3927(a), and 3921(a), respectively.

slip inside a special plastic deposit bag complete with the bank's logo on it, return it to the safe to await pick-up by a school district driver/courier. The next step according to [Appellant] was then to enter the amount deposited by a particular student group into a computer software program. The software program used was "Quicken[."] The Quicken program kept track of all the student groups and maintained running balances of how much money each group had. This sequence, according to [Appellant] would prohibit her from then going back inside the bank deposit plastic bags and removing any money. Contributing to this is the fact that the reports from Quicken always matched the numerical reflection of the money inside the student group delivered deposit envelopes.

The government's theory, however, had more persuasive punch. After [Appellant] would verify the money received matched the numerical reflection on the outside of the deposit envelope, she would enter that figure into Quicken. This ensured that each student group's running balance in Quicken would be consistent with each group[']s own record keeping. Only after that task was completed, would [Appellant] then complete the bank deposit slip. It is at this point, where cash could be diverted from the student generated deposit envelope to [Appellant's] own pocket. Contributing to this opportunity of theft is that the actual bank deposit slips which were placed inside the plastic deposit bags were never returned to [Appellant]. Those went to the central office. The central office, for some reason, had no access to the Quicken program. [Appellant] was the only person who had the password for that program.

Trial Court Opinion, filed 12/1/10, at 3–4.

On March 11, 2010, Appellant filed her Post Sentencing Motion and her Motion to Reconsider Sentence. In her Post Sentencing Motion, Appellant claimed, *inter alia,* trial counsel had been ineffective for failing to call character witnesses on her behalf at trial and that the evidence had been insufficient to sustain her convictions. The sentencing court held a hearing on Appellant's Post Sentencing Motion on June 28, 2010, during which time it considered and denied Appellant's ineffective assistance of counsel claims.

Appellant filed a timely appeal on July 23, 2010. On July 28, 2010, the trial court ordered Appellant to file a statement of the matters complained of on appeal no later than August 19, 2010, and Appellant complied on that date. In her statement filed pursuant to Pa.R.A.P. 1925, Appellant stated trial counsel had been ineffective, claimed the verdict was contrary to the weight of the evidence and averred the evidence had been insufficient to sustain her convictions. In her brief, Appellant sets forth the following Statement of the Question Presented:

I. Did the trial court err in not granting [Appellant] a new trial where she indicated to the trial court that she wanted to call character witnesses, that she provided a list of potential character witnesses to trial counsel who failed to investigate, inquire of these witnesses, subpoena these witnesses where no reasonable trial strategy would explain his failure to do so?

II. Was the evidence insufficient as a matter of law to sustain a conviction of theft by deception in this case because the Commonwealth failed to prove that [Appellant] took the funds in question and that she committed deception with regard to the property?

III. Was the evidence insufficient as a matter of law to sustain a conviction of theft by unlawful taking in this case because the Commonwealth failed to prove that [Appellant] took the funds in question?

IV. Was the evidence insufficient as a matter of law to sustain a conviction of theft by failure to make required disposition of funds in this case because the Commonwealth failed to prove that [Appellant] took the funds in question?

Brief for Appellant at 7.

Appellant's first assertion of error is based upon ineffective assistance of trial counsel. Appellant filed a Post Sentencing Motion wherein she raised a claim of trial counsel's ineffectiveness. In an Order filed on March 18, 2010, the sentencing court directed Appellant to supplement her Motion with pertinent transcripts and an affidavit or a signed statement from trial counsel on the issue and otherwise comply with the law regarding the failure to call character witnesses as set forth in *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 599 (2007).[3] Appellant complied with the trial court's Order on April 6, 2010, by filing pages of the trial transcripts that pertained to the issue of character witnesses and an affidavit signed by trial counsel. In the affidavit, to which the four page list of suggested character witnesses Appellant prepared was attached, trial counsel stated that "[f]ollowing con-

sultation with the undersigned, I suggested that we concentrate on the charges filed and use the character witnesses at sentencing, if necessary." *See* Affidavit dated March 29, 2010.

The sentencing court conducted an evidentiary hearing on June 28, 2010, at which time it heard argument on Appellant's ineffectiveness claim. At the conclusion of the hearing, the trial court made a finding on the issue of trial counsel's effectiveness and also addressed that issue in its Opinion filed pursuant to Pa.R.A.P. 1925(a).

In *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), our Supreme Court announced a general rule providing a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review" pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546. *Grant*, at 738. Nevertheless, in *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), *reargument denied*, July 17, 2003, *cert. denied*, *Bomar v. Pennsylvania*, 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004), our Supreme Court recognized an exception to *Grant* and found that where ineffectiveness claims had been raised in the trial court, a hearing devoted to the question of ineffectiveness was held at which trial counsel testified, and the trial court ruled on the claims, a review of an ineffectiveness claim was permissible on direct appeal. *See Bomar*, 826 A.2d at 853–854; *See also Com-*

---

**3.** Therein, our Supreme Court stated the following:

To establish that counsel was ineffective for failing to call a witness, Appellant must demonstrate that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to

have denied the defendant a fair trial. Failure to call a witness is not *per se* ineffective assistance of counsel, for such a decision implicates matters of trial strategy. It is Appellant's burden to demonstrate that trial counsel had no reasonable basis for declining to call Miller as a witness.

*Commonwealth v. Washington*, 592 Pa. 698, 721, 927 A.2d 586, 599 (2007) (citations omitted).

monwealth. v. Fowler, 893 A.2d 758, 763–764 (Pa.Super.2006); Commonwealth v. Wright, 599 Pa. 270, 319–320, 961 A.2d 119, 148 (2008).

In Fowler, supra, this Court reiterated our Supreme Court's delineation of the parameters of the Bomar exception as follows:

> In Commonwealth v. Bomar, 573 Pa. 426, 826 A.2d 831 (Pa.2003), this Court recognized a limited exception to Grant. Bomar was litigated under the [Com. v.] Hubbard [, 472 Pa. 259, 372 A.2d 687 (1977) ] rule [, which allowed claims of trial counsel's ineffectiveness to be raised during direct appeal]. Bomar's trial counsel withdrew from the case after sentencing, and new counsel entered the matter and filed post-sentence motions, raising claims of ineffective assistance of counsel. The trial court conducted hearings at which counsel testified, and later wrote an opinion addressing the merits of the claims. In such a circumstance, the concerns which powered the rule in Grant were not implicated; accordingly, Bomar held this Court would also pass upon the merits of the claims on direct review. Id. at 853–55; see also Commonwealth v. O'Berg [584 Pa. 11], 880 A.2d 597 (Pa.2005) (discussing Bomar). Commonwealth v. May, 584 Pa. 640, 654, 887 A.2d 750, 758 (2005); see also Commonwealth v. Chmiel, 585 Pa. 547, 889 A.2d 501 (2005) (finding Bomar exception applied where defendant filed post-sentence motions raising claims of trial counsel's ineffectiveness, hearings were conducted on ineffectiveness claims, and trial court addressed claims).

Commonwealth v. Fowler, 893 A.2d 758, 763 –764 (Pa.Super.2006).

■ However, most recently, in Commonwealth v. Barnett, 25 A.3d 371, 376–78 (Pa.Super.2011) (en banc), this Court concluded our Supreme Court has limited the applicability of Bomar and that Barnett's assertions of counsel's effectiveness are appropriately raised only on collateral review. We ultimately determined that "[w]ith the proviso that a defendant may waive further PCRA review in the trial court, absent further instruction from our Supreme Court, this Court, pursuant to Wright and Liston[4], will no longer consider ineffective assistance of counsel claims on direct appeal." Id. at 377. As such, we dismiss Appellant's first issue without prejudice to her ability to raise it in a subsequent PCRA petition, if she so chooses.

Appellant's final three issues concern the sufficiency of the evidence presented at trial. Our standard of review when considering such claims is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Com-

---

4. Commonwealth v. Wright, 599 Pa. 270, 961 A.2d 119 (2008) and Commonwealth v. Liston, 602 Pa. 10, 28, 977 A.2d 1089, 1100 (2009), respectively.

monwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brown*, 23 A.3d 544, 559–560 (Pa.Super.2011) (en banc) (citations omitted).

Theft by Deception has been defined as follows:

**(a) Offense defined.**—A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;

18 Pa.C.S.A. § 3922(a)(1).

■ Appellant argues the evidence at trial had been insufficient to sustain her conviction for Theft by Deception because the Commonwealth failed to establish she took the funds in question or that she committed deception with regard to the property. Brief for Appellant at 20. She also avers the circumstantial evidence that she took control of the funds was insufficient as a matter of law because no direct evidence linked her to the crime. Also, Appellant stresses that other individuals had access to the area in which the deposits were kept and the funds themselves

prior to the time at which they were deposited at the bank. *Id.* at 21.

At trial, Mr. Alan Bennett, the Director of Physical and School services in the Moon Area School District, testified that activity groups had deposit envelopes and would list thereon checks and cash obtained for various fundraisers before sending the envelope to the school office. When Appellant received an envelope containing money from a student activity group, she was supposed to enter the amount of the deposit using the Quicken accounting system, complete a deposit slip, place the funds in the standard late deposit bag equipped with a lock, and set it aside in preparation for the courier to pick it up and take it to the bank. *Id.* at 23–24, 40. Money was sent to the bank on a monthly basis, a report went to the student advisors so they could see the amount of money brought in and spent, and the transactions were audited annually. N.T., 12/14/09, at 21–22. The Quicken accounting program was available only on Appellant's computer. *Id.* at 24, 38.

Mr. Bennett eventually recognized that the data in Quicken did not match the amount of money reflected in the bank account. After meeting with school officials, it became apparent to Mr. Bennett that funds were potentially missing, and a CPA firm was hired to perform a full audit of the entire system. *Id.* at 26–27. A police investigation ensued, and Appellant was suspended without pay though she continued to have her employee benefits provided pending the outcome of trial. *Id.* at 27–30.

Mr. Peter Vancheri, a CPA, testified his analysis revealed variances between amounts recorded and the actual bank deposits. *Id.* at 46. He asked the club treasurers to confirm what they believed the balances in their respective accounts to be and noted the differences. *Id.* at 47.

He discovered that while deposits had been recorded in the software, no deposit had been recorded in the bank for certain basketball games. He also noticed an October 5, 2007, football game deposit in the amount of $6,334.00 was not in the bank account. *Id.* at 47–48. Mr. Vancheri explained "the amounts recorded in the Quicken software agreed to the bank deposit envelopes, but the bank deposit in certain instances was less than what was on the envelopes and less than what was recorded in the Quicken software." *Id.* at 48. The total amount of money he discovered to be missing from the activity fund was $22,976.20, and the general fund lacked $6,334.00. *Id.* at 51.

Mr. Michael A. Houser testified that among his duties as the Senior Principal at Moon Area Senior High School was the supervision of the student activity fund. *Id.* at 65–66. He reiterated the process of how money raised by students was initially tallied and delivered. He explained Appellant held the title of assistant secretary/bookkeeper as of the fall of 2007 and, as such, had the responsibility to verify the amount of money and deposit it in the bank. *Id.* at 67–69. Appellant also had a duty to seal the money bags and notify Mr. Houser if the amount of money in a given envelope did not match the amount recorded thereon. *Id.* at 71, 93. Mr. Houser did not have access to Quicken. *Id.* at 74.

Mr. Houser explained he, Appellant, Mrs. Olsen, his administrative assistant, and the assistant principals had access to the vault where the locked bank bags were kept and that once bags were placed in there, they remained locked until they were unlocked at the bank. *Id.* at 76. On the occasion that Appellant was absent from work, the envelopes would be placed in the vault until her return, and any substitute for her would not verify the funds in the envelope or have access to them at all. *Id.* at 91–92. Near the end of 2007, Mr. Houser became aware of a missing deposit from one of the school's athletic contests, and he questioned Appellant about the whereabouts of the money, but she was unable to account for it. *Id.* at 75. At the outset of the next school year, Mr. Houser became aware of additional significant inconsistencies in the deposits that had been made. *Id.* at 75–76.

Ms. Lori Lemieux testified that as an English teacher at Moon Area High School, she was involved in student clubs including the Student Impact Club. *Id.* at 94. She never was made aware of any discrepancies in or missing money from her student account. *Id.* at 99. Ms. Gail DeMarco also testified she was the sponsor of the class of 2010 and was involved in the planning of the Holiday Ball in December of 2008, the proceeds of which were handed over to Appellant. *Id.* at 104. She asked Appellant for balance sheets of ticket sales, but she did not receive them until about a month later. She and her students had been keeping track of sales independently as well. *Id.* at 105–106. It was never brought to Ms. DeMarco's attention that the amount of money in an envelope was less than the amount indicated thereon. *Id.* at 106.

Mr. John Scott testified he had been employed for fifteen years as a courier for the Moon School District. N.T., 12/15/09, at 110–111. The bags he received from Appellant were either sealed plastic bags that cannot be opened without ripping them or locked bags for which he did not have a key. *Id.* at 112–113. Mr. Scott was unaware of the actual amount of any deposit as he merely dropped off deposits at the bank. *Id.* at 113–114.

Ms. Michelle Grimm testified that until June of 2007 she had been the associate bookkeeper at Moon Area High School for five years. *Id.* at 120. She reiterated the

procedure for making deposits and related the job training she provided Appellant. *Id.* at 121–124. She explained that while she held the position, she had been responsible for depositing funds in the activity account, general account, and athletic account, and only she had access to Quicken and the duty to enter data therein. *Id.* at 125–126. Ms. Grimm explained that when she received an envelope of money, regardless of the number of individuals who may have handled or where it had been placed prior to her receipt of it, she bore the responsibility of making sure the amount of money indicated on the outside of the envelope was inside, and she would not make a deposit if the numbers did not match. *Id.* at 131. When Appellant took the position, the Quicken software was reinstalled, and Appellant set up a new password. *Id.* at 126.

Ms. Valerie Hallisey who was employed with the accounts payable office in the Moon Area School District testified that while she did not handle cash, she paid all the invoices, kept records all the deposits and handled the balancing of bank statements for the high school and middle school. *Id.* at 134–135. She worked with Appellant in 2007 concerning funds that Appellant was going to deposit into the general fund, because Appellant handled funds from the student activities on her own. *Id.* at 136–137. Ms. Hallisey did not have access to the Quicken software, nor did she have a password. *Id.* at 138. Ms. Hallisey had difficulty getting Appellant to provide her with receipts from football games, though she sent numerous emails and made several phone calls requesting the information. *Id.* at 138–139. The money she sought never made it into the general account. *Id.* at 140. Ms. Hallisey

noted that no deposits had been made for four or five football games in the 2007 season into the general fund and estimated that an average deposit for a football game would be in an amount of $6,000.00. *Id.* at 144–145.

Ms. Jacqueline Weibel testified she provides forensic accounting services to the District Attorney's Office and is a certified fraud examiner. *Id.* at 145–146. Ms. Weibel explained entries on Commonwealth exhibits including envelopes and deposit slips and Quicken documents. Utilizing a spreadsheet she had created which detailed the manner in which deposits were made, she remarked that in every instance, the same dollar amount indicated on the envelope had been entered into Quicken, and the date on the Quicken entry was the same as the date on the deposit slip. *Id.* at 154. Ms. Weibel observed that in seventeen out of twenty-three deposits, the entire amount of the cash was missing from the deposit. *Id.* at 155. She also discovered that a particular deposit for a football game differed from the others in that no deposit had been entered into Quicken, though for the other football events deposits in the bank matched the ticket sales. *Id.* at 156. She ultimately calculated $29,310.20 was missing. *Id.* at 157.

Appellant testified she began working for Moon Township in 1993 and began as a substitute custodian in various buildings. *Id.* at 172. Her first day as assistant secretary/bookkeeper was August 1, 2007, though nobody trained her during that month. *Id.* at 173–175. Appellant indicated that it had been fifteen years since she had seen bank deposit bags made of cloth and equipped with a lock and that she used plastic bags for deposits. *Id.* at 183.[5] She

5. We note that when she was testifying, Appellant referred to the money as being in bags, until her counsel brought this fact to her attention, at which time she corrected herself and used the term "envelope." *Id.* at 187.

explained she did not always hand the courier the deposit bags and had no way of knowing if someone else received the bags while she was away from her desk. *Id.* at 184, 186–187. She also stated that she never received verification of deposits from the bank as her receipts were going to the central office. *Id.* at 190, 192.

Appellant testified that prior to hearing Ms. Hallisey's testimony, she had not been aware of any problems with money from four or five football games in 2007 and explained she wrote up a triplicate deposit slip for the money from the October game which went into the general fund. *Id.* at 196, 199. When asked to explain why there might be a discrepancy between what had been documented in the Quicken system and what was ultimately deposited in the bank, Appellant responded as follows: "I would make the deposit and enter it into the Quicken system. After that I never went back into these bags. They were given to the currier [sic] and taken to the bank, and the receipts went to central office. I have no idea what took place after these were out of my possession." *Id.* at 205. Appellant testified she never took any cash from the accounts and that it was possible each of the bank envelopes in question could have been tampered with by someone else who had access to the safe. *Id.* at 205, 222–223.

Upon our review of the aforementioned evidence, we find the Commonwealth established the elements of Theft by Deception. While it was indicated other individuals may have handled the deposit envelopes and had access to the safe room, Appellant was the only individual with access to Quicken and who had the responsibility of verifying the contents of each deposit envelope and placing it in a sealed deposit bag for delivery to the bank. As such, through an abundance of uncontradicted circumstantial evidence, the Commonwealth established Appellant intentionally and deceptively withheld currency that belonged to the school district by removing cash from deposit envelopes after verifying their contents in Quicken which created the false impression that the various student groups' finances were in order.

■ Appellant next asserts the evidence had been insufficient to sustain her conviction of Theft By Unlawful Taking–Movable Property and Theft by Failure to Make a Required Disposition of Funds Received due to the Commonwealth's failure to prove she took the funds in question. To establish the former crime, the Commonwealth must have proven that Appellant unlawfully took or exercised unlawful control over movable property of another with intent to deprive him thereof. 18 Pa. C.S.A. § 3921(a). The latter crime has been defined as follows:

(a) **Offense defined.**—A person who obtains property upon agreement, or subject to a known legal obligation, to make specified payments or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he intentionally deals with the property obtained as his own and fails to make the required payment or disposition. The foregoing applies notwithstanding that it may be impossible to identify particular property as belonging to the victim at the time of the failure of the actor to make the required payment or disposition.

18 Pa.C.S.A. § 3927(a).

■ In support of her claim the evidence was insufficient to establish Theft by Unlawful Taking–Movable Property, Appellant generally avers that "[s]ince the Commonwealth's circumstantial evidence

did not exclude the other individuals who had equal access to the missing funds, the evidence was insufficient to sustain a conviction." Brief for Appellant at 23. In support of the assertion the evidence was not sufficient to establish the crime of theft by Failure to make a Required Disposition of Funds Received, Appellant avers only that the Commonwealth failed to prove she took possession of the property and dealt with it as her own and "incorporates her previous factual allegations regarding insufficiency." *Id.* at 23. As Appellant has failed to develop these claims properly by specifically discussing the elements of the crime and those which the Commonwealth failed to prove, Appellant has waived these claims for lack of development. *See Commonwealth v. McDonald*, 17 A.3d 1282, 1286 (Pa.Super.2011) citing Pa.R.A.P. 2119(a); *Commonwealth v. Johnson*, 604 Pa. 176, 191, 985 A.2d 915, 924 (2009) (finding "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived") (citations omitted).[6]

Judgment of sentence affirmed. Ineffective assistance of counsel claim dismissed without prejudice to raise it on collateral review. Jurisdiction relinquished.

BOWES, J. concurs in result.

---

6. Even if Appellant had not waived her third and fourth issues, in light of our discussion of her second issue raised on appeal, we would find the trial court did not err in determining the Commonwealth had presented sufficient evidence to convict her of all three crimes with which she had been charged.